# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH A. MASSI, | ) | CASE NO.  1:15CV1132 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Joseph A. Massi ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§

423, 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties.  For the reasons set forth below, the Commissioner's final decision is

REVERSED and this matter is REMANDED for further proceedings consistent with this

decision.

## I.   PROCEDURAL HISTORY

In November 2011, Plaintiff filed applications for POD and DIB, and for SSI,

alleging a disability onset date of October 18, 2010.  (Transcript ("Tr.") 125.)  The claims

were denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  On January 22, 2014, an ALJ held Plaintiff's

hearing.  (Tr. 20-42.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On February 12, 2014, the ALJ found Plaintiff not disabled.  (Tr.122-43.)  On May 19, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr.1-3.)

On June 4, 2015, Plaintiff filed a complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos.11,13,15.)

Plaintiff asserts the following sole assignment of error: The ALJ did not properly weigh the medical opinions of record.  (Doc. No. 11.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in 1964 and was 48 years-old on the date last insured.  (Tr. 76.)  He had at least a high school education and was able to communicate in English.  (Tr. 25.)  He has past relevant work as a machine operator.  (Tr. 37, 136.)

### B.   Medical Evidence

#### 1.   Medical Reports-Physical Impairments

On June 17, 2009, Plaintiff presented to the emergency room for a left shoulder injury after he fell through a roof.  (Tr. 523-527.)  He complained of back, neck, shoulder and arm pain.  *(Id.)*  Plaintiff underwent an x-ray of his left shoulder, which showed no evidence of fracture.  (Tr. 377.)  Plaintiff was assessed with left shoulder contusion and sprain and prescribed pain medication.  (Tr. 524, 527.)

2

Between the date of the fall and the middle of April 2010, Plaintiff presented to Laxman Cingireddi, M.D.  Plaintiff's physical condition was mostly normal, with Dr. Cingireddi consistently noting normal range of motion and 5/5 strength in Plaintiff's bilateral upper and lower extremities.  (Tr. 339-344.)  In November 2009, however, Plaintiff complained of left elbow pain.  (Tr. 342-343.)  Dr. Cingireddi diagnosed "tennis elbow," and administered steroid injections in November 2009 and February 2010.  (Tr. 340-344.)  In March 2010, Plaintiff reported that the steroid injections had completely resolved his pain.  (Tr. 339.)

In April and May of 2010, Plaintiff complained of severe neck pain, low back pain and shoulder pain to Dr. Cingireddi.  (Tr. 331-333, 335, 337.)  He repeatedly requested pain medication and refused physical therapy, stating either he was doing it at home or that he could not tolerate it.  (*Id.*)  Dr. Cingireddi prescribed pain medication and referred Plaintiff for an MRI.  (*Id.*)

Plaintiff underwent an MRI of his left shoulder on May 7, 2010.  (Tr. 446-447.)  This MRI revealed (1) a small full- thickness tear of the distal anterior supraspinatus tendon with minimal retraction; and (2) suspected tendinopathy, tenosynovitis and possibly partial thickness tear of the extra-articular portion of the long head biceps tendon.  (*Id.*)  On that same date, Plaintiff underwent MRIs of his cervical and lumbar spines.  (Tr. 370-371, 448-449.)  These MRIs showed (1) lower lumbar degenerative changes notable for L5 bilateral pars defects and moderate bilateral foraminal encroachment at L5-S1; and (2) minimal upper cervical degenerative interspace changes.  (*Id.*)

On June 3, 2010, Mark Verdun, D.O., examined Plaintiff and reviewed his MRI

3

results.  (Tr. 326.)  Dr. Verdun recommended shoulder arthroscopy with decompression and rotator cuff repair, along with pain management for the lumbar spine.  (*Id.*)  He also informed Plaintiff that he must dedicate significant time to rehabilitation and curtail his activities as a janitor and landscaper, and that failure to complete physical therapy could contribute to a poor outcome.  (*Id.*)

On June 4, 2010, Plaintiff called Dr. Cingireddi's office and in his absence, spoke to David Parker, M.D., who reported that even though Plaintiff had been given a prescription for Percocet on May 27, 2010 for 30 pills to carry him through to his orthopedic appointment (Tr. 329), Plaintiff complained he had not been given anything for pain.  Nevertheless, on June 8, 2010, Plaintiff was given another prescription for 30 Percocet pills.  (Tr. 328.)

Orthopedic surgeon, William Seeds, M.D., examined Plaintiff in June 2010, who complained of shoulder injury, back pain and neck pain on his left side.  (Tr. 403.)  After reviewing Plaintiff's MRI, Dr. Seeds recommended and scheduled arthroscopic surgery on Plaintiff's left shoulder.  (Tr. 401-05).  On July 1, 2010, Dr. Seeds performed arthroscopic surgery to repair a rotator cuff tear and shoulder impingement.  (Tr. 408.)  During post-operative follow-up visits, Dr. Seeds reported the shoulder was progressing well and recommended continued physical therapy.  (Tr. 410-413.)  Six weeks after the surgery, Plaintiff had excellent range of motion and no adhesions.  (Tr. 415.)  Dr. Seeds was very happy with Plaintiff's progress and intended to proceed with strength training. (*Id.*)

In September 2010, Plaintiff complained of left elbow pain to Dr. Seeds, whose impression was that prior injections of the elbow from Plaintiff's primary care physician

4

caused no improvement in the condition.  (Tr. 417.)  Dr. Seeds referred Plaintiff for an MRI of the left elbow, which was performed on October 11, 2010 and showed a partial tear of the common extensor tendon and lateral epicondylitis with tendinosis.  (Tr. 451-452.)  Dr. Seeds recommended surgery.  (Tr. 419-420.)

Dr. Seeds performed left elbow surgery on October 21, 2010.  (Tr. 423.)  In November and December of 2010, Plaintiff reported only dull pain in his elbow.  (Tr. 425 - 428.)  Dr. Seeds remained happy with Plaintiff's progress (Tr. 430) until August of 2011, when Plaintiff reported constant pain in his left elbow with a pain level of 6.  (Tr. 432.)  At that time, Plaintiff had full range of motion, no instability and 5/5 muscle strength.  (Tr. 433.)  Dr. Seeds determined steroid injections would not be helpful and continued Plaintiff on pain medication.  (*Id.*)

On November 18, 2011, Plaintiff reported constant left elbow pain at a level of 8. (Tr. 435.)  Dr. Seeds ordered a repeat MRI, noting that "patient is looking at the possibility of disability which I would fully support presently."  (Tr. 436.)  An MRI was conducted on November 22, 2011, and revealed (1) a small interstitial partial tear at the lateral epicondyle attachment; (2) tendinosis of the distal of the biceps tendon; and, (3) small elbow joint effusion.  (Tr. 453.)

Based on the results of the MRI, Dr. Seeds ordered an EMG of Plaintiff's left upper extremity.  (Tr. 438-439.)  He noted that the "plan at this point will be to consider possible operative intervention without further debridement."  (Tr. 439.)  Plaintiff underwent an EMG on December 2, 2011, which was normal.  (Tr. 457.)  Dr. Seeds then determined surgery might not be indicated and recommended further pain management with possible stellate block injections.  (Tr. 440-441.)

5

In September 2012, Plaintiff presented to orthopedist Peter J. Evans, M.D., Ph.D., for evaluation of chronic left arm pain.  (Tr. 471-472.)  Dr. Evans was unable to find any mechanical symptoms in Plaintiff's shoulder, elbow, hand or wrist.  (Tr. 471.)  He did not believe Plaintiff had complex regional pain syndrome ("CPRS") and, in fact, found "no explanation for [Plaintiff's] pain."  (*Id.*)  Dr. Evans concluded Plaintiff "would benefit from multimodality pain management which includes full psychological evaluation."  (*Id.*)

Plaintiff presented to pain management specialist Manu Mathews, M.D., and registered nurse Joan Jersan, R.N., on December 12, 2012.  (Tr. 509-515.)  Plaintiff complained of "almost constant" shooting pain in the left elbow down to the hand; and numbness, tingling, swelling, and a cold sensation in his fingers.  (Tr. 509.)  He also reported constant aching or sharp pain along the lateral left side of his body from his neck to his toes, along with numbness and tingling down the lateral left leg.  (*Id.*)  He rated the severity of his pain generally varied from 7 to 9.  (*Id.*)

Dr. Mathews noted tenderness along Plaintiff's entire left side and moderate pain on full extension of the left elbow.  (Tr. 511.)  Plaintiff had a depressed and anxious affect, and a preoccupation with finding a diagnosis for his pain.  (*Id.*)  His judgment and insight were fair, however, and his attention span and concentration appeared normal.  (*Id.*)  Dr. Mathews diagnosed the following: (1) cervicalgia; (2) ulnar neuritis; (3) mylagia; (4) low back pain; (5) post traumatic stress disorder; and (6) pain disorder with medical and psychologic features.  (Tr. 511.)  He concluded Plaintiff has a "significant degree of pain and disability and depression and PTSD that have not been addressed so far," and recommended multimodality treatment including exercise, medication, and

6

psychophysiological pain and stress management.  (*Id.*)

### 2.     Medical Reports– Mental Impairments

Between July 2009 and January 2013, Plaintiff presented primarily to Dr. Cingireddi for mental health treatment.  (Tr. 318-346, 561-573.)  He complained of stress, depression, and anxiety throughout the last half of 2009 and 2010, and was prescribed various medications, including Klonopin, Mirtazapine, Effexor and Diazepam. (*Id.*)  In 2011, Plaintiff reported his medication was working and denied depression, anxiety, and crying spells.  (Tr.  318-322, 573.)

In June 2012, however, Plaintiff complained of increased anxiety.  (Tr. 570.)  Dr. Cingireddi increased his medication and recommended he see either a counselor or psychiatrist.  (*Id.*)  Plaintiff refused treatment with a counselor or psychiatrist.  (*Id.*)  In January 2013, Dr. Cingireddi again recommended mental health treatment with a counselor or psychiatrist and, again, Plaintiff refused.  (Tr. 561-562.)

Plaintiff apparently changed his mind, however, and began treatment with psychiatrist Michael Gorjanc, M.D., in August 2013.  (Tr. 533-535.)  Plaintiff reported sleep problems, increased stress, and crying spells.  (Tr. 533.)  Dr. Gorjanc noted a restricted and congruent affect, mild to moderate depression, mild anxiety, and mild anhedonia.  (Tr. 534.)  He diagnosed major depressive disorder and anxiety disorder, and assessed a Global Assessment of Functioning ("GAF") of 55, indicating moderate symptoms.[1]  (Tr. 535.)  Dr. Gorjanc prescribed Paxil and Trazadone, and referred

---

[1]The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or

Plaintiff to social worker H. Douglas Horbeck, LISW,  for weekly counseling sessions.[2] (Tr. 533.)

Plaintiff presented to Mr. Horbeck on a regular basis between August 2013 and January 2014.  (Tr. 537-559.)  Initially, Plaintiff complained of anxiety and sleep problems.  (Tr. 556.)  Many of Mr. Horbeck's treatment notes relate to Plaintiff's concerns regarding legal problems (including felony drug charges) and family issues. (Tr. 537-559.)  The record reflects improvement over time, however, with Plaintiff reporting better sleep, better focus and concentration, and increased affect and mood. (Tr. 554, 553, 552, 549.)  In September 2013, Plaintiff reported "feel[ing] great" and going for walks.[3]  (Tr. 551-552.)  The following month, Plaintiff reported feeling well, going to the library, and becoming more familiar with the computer.  (Tr. 548-549.)  Mr. Horbeck described Plaintiff as "continuing to grow in level of self-confidence and comfort."  (Tr. 547.)  In November 2013, Plaintiff was "doing well" with a stable mood

---

school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

[2]  The record also contains three pages of an undated mental status exam.  (Tr. 557-559.) It is signed by Mr. Massi, but does not contain the signature of a physician or other mental health professional.  The Commissioner appears to assume that social worker Douglas Horbeck completed the assessment.  (Doc. No. 13 at 9.) This document describes Plaintiff as easily distracted with poor insight, fair judgment, and fair impulse control.  (Tr. 557.)  It diagnoses Plaintiff with major depression and general anxiety disorder; and assesses a GAF of 40, indicating serious symptoms.  (*Id.*)

[3] Plaintiff returned to Dr. Gorjanc on September 5, 2013.  (Tr. 531-532.)  Dr. Gorjanc assessed mild depression, mild anxiety, and a restricted affect.  (Tr. 531.)  He continued Plaintiff on his medications.  (Tr. 532.)

and affect.  (Tr. 546-547.)

Plaintiff presented to Dr. Gorjanc in December 2013.  (Tr. 529-530.)  Plaintiff reported improved sleep, a good mood, and generally that "things were going really good."  (Tr. 530.)  Dr. Gorjanc assessed no depression, mild anxiety, and a full affect. (Tr. 529.)  He continued Plaintiff on his medications.  (Tr. 530.)  Mr. Horbeck's treatment notes from the same month indicate Plaintiff was maintaining progress and had increased affect, mood, and sleep.  (Tr. 539.)  In January 2014, Plaintiff reported "feeling well."  (Tr. 538.)  Mr. Horbeck noted that Plaintiff continued to show increased affect and improved sleep.  (Tr. 537.)

### 3.  Agency Reports

#### a.  Physical Impairments

In February 2012, state agency physician Bradley Lewis, M.D., reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 82-86.)  He diagnosed Plaintiff with major joint dysfunction and opined Plaintiff was capable of lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of about 6 hours in an 8 hour workday; and, sitting for a total of about 6 hours in an 8 hour workday.  (Tr. 80, 82.) Plaintiff was limited to occasional use of push/pull controls with his left upper extremity. (*Id.*)  He had an unlimited ability to climb ramps and stairs, balance, stoop, kneel and crouch, but could only occasionally climb ladders, ropes, and scaffolds, and crawl.  (Tr. 82-83.)  Plaintiff was limited to occasional reaching (in all directions) with his left upper extremity.  (Tr. 83.)

9

In September 2012, Plaintiff presented to Wilfredo M. Paras, M.D., for a consultative physical examination.  (Tr. 464-465.)  Plaintiff complained of constant pain in his left shoulder joint with occasional swelling and pain that is aggravated by prolonged sitting, standing and frequent bending.  (Tr. 464.)  He also reported tingling and numbness down his left hand with a "constant, cold feeling of his left hand."  (*Id.*) Plaintiff stated he could not lift objects with his left hand, and reported dropping objects and being unable to open jars, button or unbutton clothing, and/or use a zipper.  (*Id.*)

Dr. Paras observed that Plaintiff held his left arm in a flexion contracture position. (Tr. 465.)  He also noted Plaintiff "walked slowly with a limp, with partial weight bearing on the left leg apparently due to pain in the left hip and low back, without any assistive device."  (*Id.*)  Plaintiff's deep tendon reflexes were reduced bilaterally and some muscle atrophy was noted in his left upper extremity and thigh.  (*Id.*)  On manual muscle testing and range of motion examination, Plaintiff was unable to perform range of motion of the left shoulder due to severe pain.  (*Id.*)  Plaintiff was also unable to perform range of motion of his left hand fingers.  (*Id.*)  Plaintiff's left hand dynamometry was zero and he did not show any strength in that hand.  (*Id.*)  Plaintiff also reported pain in his left hip and lower back.  (*Id.*)

Dr. Paras concluded Plaintiff "currently has no normal use of the left upper extremity."  (Tr. 465.)  He opined Plaintiff's "general work limitation at this time is less than sedentary" and he "appears to be at the disability level at this time mainly due to his left rotator cuff and left elbow injuries."  (*Id.*)

In October 2012, state agency physician Jeffrey Vasiloff, M.D., reviewed Plaintiff's medical records (including Dr. Paras' report) and completed a Physical RFC

Assessment.  (Tr. 96, 99-100.)  Dr. Vasiloff diagnosed major joint dysfunction and

degenerative disc disease.  (Tr. 96.)  Like Dr. Lewis, Dr. Vasiloff opined Plaintiff was

capable of lifting and/or carrying up to 20 pounds occasionally and 10 pounds

frequently; standing and/or walking for a total of about 6 hours in an 8 hour workday;

and, sitting for a total of about 6 hours in an 8 hour workday.  (Tr. 99.)  Dr. Vasiloff also

agreed Plaintiff was limited to occasional use of push/pull controls with his left upper

extremity.  (*Id*.)  With regard to postural limitations, Plaintiff could frequently climb ramps

and stairs, stoop, kneel, crouch and crawl, but only occasionally climb ladders, ropes,

and scaffolds.  (*Id*.)  Plaintiff had no manipulative limitations with respect to his right

upper extremity.  (Tr. 100.)  However, with regard to his left upper extremity, Plaintiff

was limited to no overhead reaching, frequent reaching in all other directions, and

frequent handling.  (*Id*.)

### b.    Mental Impairments

In April 2012, Plaintiff underwent a consultative examination with clinical

psychologist Richard Halas, M.A.  (Tr. 459-463.)  Plaintiff reported he had enjoyed good

health until he fell through a roof, severely injuring his back, left shoulder, and elbow.

(Tr. 459.)  Plaintiff denied having a psychiatric history and indicated he had never

consulted with a psychologist or psychiatrist for personality or emotional problems.  (Tr.

460.)  However, he reported crying spells, severe sleep problems, and feelings of

hopelessness, helplessness, and worthlessness.  (Tr. 461.)  On examination, Dr. Halas

noted a slow, hesitant, and constricted speech pattern.  (*Id*.) Plaintiff demonstrated poor

eye contact, high levels of anxiety; trembling hands; and frequent tearfulness during the

examination.  (*Id*.)  However, Plaintiff's overall presentation in terms of mental content

11

was "within normal limits," and Dr. Halas observed no fragmentation of thought, irrelevancy, or incoherency.  (*Id.*)  Dr. Halas additionally found that Plaintiff's short term memory was good and observed Plaintiff "was able to concentrate and recall five digits forwards."  (Tr. 462.)  Dr. Halas assessed Plaintiff's level of insight and judgment as being good.  (*Id.*)

Dr. Halas diagnosed depressive disorder and generalized anxiety disorder.   (Tr. 462.)  He assessed Plaintiff's GAF score as follows:

> GAF SCORE with this claimant is 45 for serious symptoms.  The claimant has significant psychological issues.  Functional severity is above this level, at 55.  The claimant reported having few friends.  The claimant's overall GAF score becomes 45, as this is the lower of the two scores.

(Tr. 463.)  Dr. Halas opined Plaintiff had little to no difficulty in (1) understanding, remembering and carrying out instructions; and (2) maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.  (*Id.*)  However, he concluded Plaintiff "would appear to have significant problems" in responding appropriately to supervision and to co-workers in a work setting, and responding appropriately to work pressures in a work setting.  (*Id.*)

In April 2012, state agency psychologist Leslie Rudy, Ph.D., reviewed Plaintiff's medical records and completed a Mental RFC Assessment.  (Tr. 80, 84-86.)  Dr. Rudy found Plaintiff suffered from anxiety and affective disorders that caused mild restrictions in activities of daily living; moderate limitations in social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration.   (Tr. 80.)  Dr. Rudy opined Plaintiff was not significantly limited in his abilities to (1) carry out very short and simple instructions; (2) perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; and (5) make simple work-related decisions.  (Tr. 84.)  She found Plaintiff was moderately limited in his abilities to carry out detailed instructions; maintain attention and concentration for extended periods; and, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)

Dr. Rudy also determined Plaintiff was moderately limited in his abilities to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (4) respond to changes in the work setting.  (Tr. 85.)  In the narrative section of her assessment, Dr. Rudy explained that Plaintiff "retains the capacity to interact on an occasional and superficial basis" and is "limited to infrequent work place changes due to anxiety/depression."  (*Id.*)

In September 2012, state agency psychiatrist Aracelis Rivera, Psy.D., reviewed Plaintiff's medical records and completed a Mental RFC Assessment.  (Tr. 96, 100-102.) Dr. Rivera reached the same conclusions as Dr. Rudy.  (*Id.*)

**C.     Hearing Testimony**

**1.     Plaintiff's Hearing Testimony**

During the January 22, 2014 hearing, Plaintiff testified to the following:

- He has a high school education, and has not had any vocational training. He lives in a one-story house with his wife.  (Tr. 25, 27.)

13

- In 2009, he was working at a construction job when he fell through a roof.  (Tr. 34-35.)  He was stuck in the roof for forty-five minutes.  (*Id.*)  He worked the next day, but then went to the emergency room where he received pain medication.  (*Id.*)  He continued to try to work after the accident but was unable to do so due to pain in his left shoulder, elbow, and lower back.  (Tr. 31, 34-35.)  He has worked since he was 13 years old, and feels depressed because he can no longer do so.  (Tr. 33-34.)

- He had surgery on his left shoulder and left elbow after the accident.  He thought he would recover but "it didn't happen like that."  (Tr. 30.)  He "went through every procedure possible" but nothing helped.  (*Id.*)  He could not afford physical therapy.  (*Id.*)  He tried to do physical therapy at home but was unable to tolerate it due to pain.  (*Id.*)

- He cannot work due to constant pain in his left shoulder, left elbow, and left lower back.  (Tr. 31.)  He cannot sit or stand for very long due to the pain.  (*Id.*)  He is not able to lift his left arm over his head.  (Tr. 33.)  He does everything with his right hand.  (*Id.*)  He takes aspirin, tylenol, and ibuprofen, which sometimes helps.  (Tr. 31.)

- On a typical day, his wife helps him shower and get dressed.  (Tr. 28, 32.)  He lets the dog out and then sits and watches television.  (Tr. 28.)  Sometimes he reads the newspaper or watches his wife play on the computer.  (Tr. 29.)  Occasionally, he visits his elderly parents, who live about a mile away.  (*Id.*)  He does not have any hobbies and does not go to restaurants or the movies.  (Tr. 30.)

- He is not able to do household work or yard work.  (Tr. 28.)  He can only drive very short distances because of his left arm pain.  (*Id.*)  His wife works during the day, and makes his lunch for him before she leaves.  (Tr. 33.)

### 2. **Vocational Expert's Hearing Testimony**

Edoff Swik, a vocational expert ("VE"), testified at Plaintiff's hearing.  The VE testified Plaintiff had past relevant work as a machine operator, which is "a light job according to the [Dictionary of Occupational Titles] but very heavy as performed by the claimant."  (Tr. 37.)

The ALJ then posed the following hypothetical:

Then if you would [assume] a person of that claimant's age, education,

14

and past relevant work experience as the machine operator with a capacity for light work, with the ability to frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  Who could frequently stoop and kneel, frequently crouch, never crawl, who has the capacity to use the lower extremities occasionally to operate pushing and pulling controls– foot controls.  The capacity to use the left upper extremity with the exception of no reaching overhead with the left upper extremity.  The capacity to carry out simple and familiar multi-step tasks in a setting without demands or fast paced.  The capacity to interact with others on an occasional and superficial basis.  And the capacity to work where changes are infrequent.  Could such person perform the claimant's past relevant work?

(Tr. 38.)  The VE testified such an individual could perform Plaintiff's past relevant work as a machine operator "as identified in the Dictionary of Occupational Titles, but not as actually performed."  (*Id.*)

Plaintiff's attorney then asked the VE to assume an individual of Plaintiff's age, education, and work history that was limited to less than sedentary work.  (Tr. 39.)  The VE testified such an individual could not perform Plaintiff's past relevant work and, further, could not perform any other jobs in the competitive job market.  (*Id.*)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

15

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured requirements of the Social Security Act through June 30, 2012.

2.      The claimant has not engaged in substantial gainful activity since October 18, 2010, the alleged onset date. (20 CFR 404.1571 *et seq.*,

16

and 416.971 et seq.)

3.      The claimant has the following severe impairments: history of rotator cuff tear, status-post surgical repair; mild degenerative joint disease of the left shoulder; history of lateral epicondylitis with tendinosis and partial extensor tendon tear, status-post surgical repair; lumbar degenerative disc disease; anxiety disorder; depressive disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations.  The claimant could frequently climb ramps and stairs, but never ladders, ropes, or scaffolds.  The claimant could frequently stoop, kneel, and crouch, but never crawl.  The claimant could use lower extremities occasionally for operation of foot controls. The claimant could use the left upper extremity with exception of no overhead reaching. The claimant could carry out simple tasks, and familiar multi-step tasks, with no demands for fast pace.  The claimant has the capacity to interact with others on an occasional and superficial basis.  The claimant requires work activity that involves only infrequent changes.

6.      The claimant is capable of performing past relevant work as a machine operator.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from October 18, 2010, through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 125-137.)

## V.  LAW & ANALYSIS

### A.      Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

17

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.  Plaintiff's Sole Assignment of Error – Whether the ALJ Properly Evaluated the Opinions of Drs. Lewis, Vasiloff and Halas

In his sole assignment of error, Plaintiff argues the ALJ failed to properly evaluate the opinions of state agency record reviewing physicians Drs. Lewis and Vasiloff regarding Plaintiff's physical functional limitations.  (Doc. No. 11 at 10-11.)  Plaintiff further asserts the ALJ failed to properly analyze the opinion of psychological

18

consultative examiner Dr. Halas.  (*Id*. at 11-12.)  The Commissioner argues substantial evidence supports the ALJ's evaluations of these medical opinions.  (Doc. No. 13.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  (*Id.*)  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  (*Id.*)

### 1.    Drs. Lewis and Vasiloff

Plaintiff first argues the ALJ failed to adequately discuss Drs. Lewis and Vasiloff's opinions regarding Plaintiff's left arm limitations.  Specifically, Plaintiff asserts the ALJ failed to acknowledge or address the following:  (1) Dr. Lewis' opinion that Plaintiff is limited to occasional reaching in all directions (i.e., towards the front, laterally, and overhead) and occasional pushing and pulling; and, (2) Dr. Vasiloff's opinion that Plaintiff is limited to no overhead reaching, frequent front and lateral reaching, frequent

handling, and occasional pushing and pulling.  (Doc. No. 11 at 11-12.)  Plaintiff asserts

the failure to address these opinions and accommodate them in the RFC is not

harmless error because the only job identified by the VE is machine operator, which

involves frequent reaching and handling and the potential for "significant" pushing

and/or pulling according to the DOT.  (Doc. No. 11-1.)

      The Commissioner argues that, "largely consistent with Drs. Lewis and Vasiloff's

opinions, the ALJ accommodated Plaintiff's left arm symptoms by limiting him to 'no

overhead reaching' with the left arm."  (Doc. No. 13 at 14.)  She claims the ALJ

reasonably declined to adopt the entirety of these physicians' opinions and, therefore,

was not required to accept all of their assessed limitations.  (*Id.*)

      Here, the ALJ thoroughly recounted the hearing testimony and medical evidence

regarding Plaintiff's physical impairments, including his left upper extremity pain.  (Tr.

129- 135.)  The ALJ then considered the opinion evidence.  The decision first

discounted the opinion of consultative examiner Dr. Paras that Plaintiff was limited to

"less than sedentary" work, as being inconsistent with the weight of the objective

evidence.  (Tr. 134.)  The ALJ then discussed the opinion of an unidentified "DDS

medical consultant," which the Commissioner asserts (and Plaintiff does not contest) is

a reference to both Dr. Lewis and Dr. Vasiloff.  With regard to this opinion, the ALJ

states as follows:

> The opinion of the DDS medical consultant that the claimant is limited to a
> range of light work is entitled to great weight.  This opinion is more
> consistent with the objective findings which demonstrate good strength,
> sensation, and gait for prolonged walking and standing.  There is no
> evidence of need for an assistive device.  The claimant's activities of daily
> living, including his ability to drive a car, do household chores and repairs,
> and run errands for and assist in the care of his elderly parents are all

consistent with an ability to perform a range of light work activity.

(Tr. 134.)  With regard to his physical impairments, the RFC limited Plaintiff as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work[4] as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations.  The claimant could frequently climb ramps and stairs, but never ladders, ropes, or scaffolds.  The claimant could frequently stoop, kneel, and crouch, but never crawl.  The claimant could use lower extremities occasionally for operation of foot controls.  **The claimant could use the left upper extremity with exception of no overhead reaching**. * * *

(Tr. 129-130) (emphasis added).

Assuming the ALJ's analysis of the unidentified "DDS medical consultant" is, in fact, a reference to Drs. Lewis and Vasiloff, the Court finds the ALJ failed to adequately address these physicians' opinions regarding Plaintiff's left arm limitations.  The ALJ purports to accord "great weight" to these opinions but fails to acknowledge, at any point in the decision, that both Dr. Lewis and Dr. Vasiloff concluded Plaintiff had a limited capacity to reach, push/pull and (in the case of Dr. Vasiloff) handle with his left upper extremity.  Indeed, the ALJ's analysis of this opinion evidence makes no mention of either doctor's assessment of Plaintiff's left arm functional limitations.  Nor does the ALJ explain how any of the reasons for purportedly according these opinions "great weight" relate to Plaintiff's left arm impairment.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

Moreover, the ALJ fails to discuss the differences between Dr. Lewis and Dr. Vasiloff's left arm restrictions, instead referring to them as a single "opinion" from one "DDS medical consultant."  In fact, Dr. Lewis and Dr. Vasiloff did not entirely agree with regard to Plaintiff's capacity to use his left upper extremity.  Although both opined that Plaintiff could only occasionally push/pull with his left arm, Dr. Lewis limited Plaintiff to occasional reaching in all directions with no handling restriction, while Dr. Vasiloff limited Plaintiff to no overhead reaching, frequent reaching in all other directions, and frequent handling.[5]

Even assuming for the sake of argument that the ALJ intended to credit Dr. Vasiloff's opinion as the most recent assessment of Plaintiff's functioning, the ALJ fails to explain why he rejected Dr. Vasiloff's conclusion that Plaintiff was limited to frequent front and lateral reaching, frequent handling, and occasional pushing/pulling.  It is well established that an ALJ is not required to discuss each and every piece of evidence in the record.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not

---

[5]  The term "frequent" means occurring from one-third to two-thirds of the time. *See* Social Security Ruling 83-10, 1983 WL 31251 at * 6 (1983). The discussion of "light work" in Social Security Ruling ("SSR") 83-10 also explains that "[m]any unskilled light jobs . . . require use of arms and hands to grasp and to hold and turn objects." *Id*.

22

support his decision, especially when that evidence, if accepted, would change his analysis.")  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the RFC conflicts, to varying degrees, with the opinions of both Dr. Lewis and Dr. Vasiloff with respect to Plaintiff's left upper extremity functional limitations.  Although an ALJ is not required to provide "good reasons" for rejecting the opinion of a non-treating source, if the RFC assessment conflicts with an opinion from a medical source, the decision must provide an explanation.  The ALJ failed to do so here.  Indeed, under the circumstances, it is not entirely clear that the ALJ even considered both Dr. Lewis' and Dr. Vasiloff's opinions, as neither physician opinion is identified in the decision either by name or exhibit number.  Moreover, the ALJ's error cannot be considered harmless, as the hypothetical posed to the VE did not include any left arm limitations other than no overhead reaching.  (Tr. 38.)

In light of the above, the Court finds the ALJ failed to properly analyze the opinions of Drs. Lewis and Vasiloff regarding Plaintiff's left arm functional limitations and, further, that this error is not harmless.  Accordingly, on remand, the ALJ should consider Drs. Lewis and Vasiloff's opinions regarding Plaintiff's left arm limitations and explain her decision to either adopt or not adopt some or all these limitations.  If the ALJ does adopt one or more of the limitations set forth in these physicians' opinions, the ALJ should obtain additional evidence to determine whether an individual with such limitation(s) would be precluded from working in jobs available in the national economy.

## 2.  Dr. Halas

Plaintiff next argues the ALJ failed to properly evaluate the opinion of consultative examiner Dr. Halas.  (Doc. No. 11 at 11.)  Specifically, he maintains the ALJ mistakenly assumed Dr. Halas assessed a GAF of 55 when, in fact, he assessed an overall GAF score of 45.  Plaintiff asserts this error is not harmless because "a score of 45 is not consistent with the ALJ's rationale that Massi is functioning within a moderate level of severity."  (*Id.* at 12.)

The Commissioner maintains the ALJ properly evaluated Dr. Halas' opinion.  She asserts that "[t]he ALJ did not adopt any GAF score; rather, she found [Dr.] Halas' functional GAF score of 55 consistent with the limitations Mr. Halas assessed."  (Doc. No. 13 at 16.)  The Commissioner further asserts that, consistent with Dr. Halas' opinion, the ALJ adequately accommodated Plaintiff's mental limitations by limiting him to simple tasks and familiar multi-step tasks with no demands for fast pace; occasional and superficial interaction with others; and work activity that only involves infrequent changes.  (*Id.* at 17.)

The ALJ discussed Dr. Halas' examination as follows:

> Although the claimant did not initially allege a mental impairment, and he denied any work-related limitations due to his depression and anxiety, the State agency ordered a consultative examination due to his history of his primary care physician prescribing medication for these impairments.  The claimant underwent evaluation on April 20, 2012, with Richard Halas, M.A.  On mental status examination, he was on-time for his appointment, presented as neat and adequately groomed, and flat affect with tearful presentation.  His hands trembled noticeably.  His memory was good for short-term recall.  He could not perform serial sevens, but could perform simple calculations.  He could concentrate and recall five digits forward.  Dr. Halas assessed a 45 for serious symptoms, but a functional severity of only 55, for moderate limitations.  (Ex. 3F/2-4.).

24

(Tr. 135.)  The ALJ then evaluated Dr. Halas' opinion, according it "considerable

weight:"

> Examining psychologist, Dr. Halas, opined that the claimant would have
> little difficulty understanding, remembering, or carrying out work-related
> instructions or maintaining attention and concentration for simple or multi-
> step tasks.  Dr. Halas suggested that the claimant would have 'significant'
> problems in his ability to interact appropriately with others and deal with
> work-related stress.  (Exhibit 3F/5).  'Significant' is not a vocationally
> helpful term, as it simply means more than minimal limitation.  Considering
> the functional GAF of 55, consistent with moderate limitations, the
> undersigned generally gives this opinion considerable weight.

(Tr. 135.)  With regard to Plaintiff's mental impairments, the RFC limits Plaintiff to simple

tasks and familiar multi-step tasks with no demands for fast pace; occasional and

superficial interaction with others; and, work activity that requires only infrequent

changes.  (Tr. 130.)

Plaintiff's argument that the ALJ fundamentally misunderstood Dr. Halas' opinion

and "adopted the wrong GAF score" is without merit.  The ALJ expressly acknowledged

that Dr. Halas assessed a functional GAF of 55 and an overall GAF of 45.  (Tr. 135.)

The ALJ determined, for the reasons set forth in the decision, that the functional GAF of

55, indicating moderate symptoms, was more consistent with the medical evidence and

the limitations Dr. Halas assessed.  The ALJ's assessment is supported by substantial

evidence in the record.  As the ALJ notes, Dr. Gorjanc assessed a GAF of 55 in August

2013.  (Tr. 135, 535.)  The ALJ also correctly states that treatment notes from Plaintiff's

counseling sessions with social worker Horbeck consistently showed improved sleep,

stable mood, and improvement with medication.   (Tr. 135, 537-559.)

Accordingly, the Court finds the ALJ properly evaluated Dr. Halas' opinion.

Plaintiff's argument to the contrary is without merit.

25

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and the case REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: March 22, 2016